UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

AMANDA C. LANGE,
on behalf of herself and all others similarly
situated, and as representative of a Class of
Participants and Beneficiaries of the Infinity
Healthcare, Inc. Employees' Flexible Profit
Sharing Plan,

               Plaintiff,

    v.

INFINITY HEALTHCARE PHYSICIANS, S.C.,
111 East Wisconsin Avenue, Suite 2100
Milwaukee, Wisconsin 53202

and

INFINITY HEALTHCARE, INC.
111 East Wisconsin Avenue, Suite 2100
Milwaukee, Wisconsin 53202

and

THE BOARD OF DIRECTORS OF INFINITY
HEALTHCARE, INC.
111 East Wisconsin Avenue, Suite 2100
Milwaukee, Wisconsin 53202

and

JOHN DOES 1-30,

               Defendants

Case No. 20-cv-737

**COLLECTIVE AND CLASS
ACTIONS PURSUANT TO
29 U.S.C. §216(b), 29 U.S.C. §
1132(a)(2), AND FED. R. CIV.
P. 23**

**JURY TRIAL DEMANDED**

**COMPLAINT**

COMES NOW Plaintiff, Amanda C. Lange, on behalf of herself and all others similarly situated, and as representative of a Class of Participants and Beneficiaries on behalf of the Infinity Health, Inc. Employees' Flexible Profit Sharing Plan (the "Plan"),[1] by her counsel, WALCHESKE & LUZI, LLC, as and for a claim against Defendants, alleges and asserts to the best of her knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the following:

## PRELIMINARY STATEMENT

1.      This is a collective and class action brought pursuant to the Fair Labor Standards Act of 1938, as amended, ("FLSA"), Wisconsin's Wage Payment and Collection Laws, Wis. Stat. § 109.01 *et seq*., Wis. Stat. § 104.01 *et seq*., Wis. Stat. § 103.001 *et seq.,* Wis. Admin. Code § DWD 274.01 *et seq*., Wis. Admin. Code § DWD 272.001 *et seq*. ("WWPCL"), the Employee Retirement Income Security Act of 1974 ("ERISA"), and Fed. R. Civ. P. 23, by Plaintiff, Amanda C. Lange, against Defendants, Infinity Healthcare Physicians, S.C., Infinity Healthcare, Inc., the Board of Directors of Infinity Healthcare, Inc., and John Does 1-30 (collectively, "Defendants").

2.      Plaintiff bring the FLSA and WWPCL claims and causes of action against Defendant Infinity Physician on behalf of herself and all other similarly-situated current and former hourly-paid, non-exempt employees of Defendant Infinity Physician for purposes of obtaining relief under the FLSA and WWPCL for unpaid overtime compensation, liquidated damages, costs, attorneys' fees, declaratory and/or injunctive relief, and/or any such other relief the Court may deem appropriate.

---

[1]     The Infinity Healthcare, Inc. Employees' Flexible Profit Sharing Plan ceased to exist in March of 2019 when it was rolled into the Envision Healthcare Corporation 401(k) Plan after Envision acquired Infinity. The ERISA claims herein only concern the Infinity Healthcare, Inc. Employees' Flexible Profit Sharing Plan.

3.     Defendant Infinity Physician operated (and continues to operate) an unlawful compensation system that deprived Plaintiff and all other hourly-paid, non-exempt employees of their wages earned for all compensable work performed each workweek, including at an overtime rate of pay for each hour worked in excess of forty (40) hours in a workweek, by failing to include all forms of non-discretionary compensation, such as monetary bonuses, shift differentials, incentives, awards, special project pay, urgent care pay, emergency department pay, wound care pay, stipends, and/or other rewards and payments, in all current and former hourly-paid, non-exempt employees' regular rates of pay for overtime calculation purposes, in violation of the FLSA and WWPCL.

4.     Defendant Infinity Physician's deliberate failure to compensate its hourly-paid, non-exempt employees for hours worked at the proper and legal rate(s) of pay violated federal law as set forth in the FLSA and state law as set forth in the WWPCL.

5.     Additionally, the law is settled that ERISA fiduciaries have a duty to evaluate fees and expenses when selecting recordkeepers, investments, and service providers, *as well as* a continuing duty to monitor fees and expenses of selected recordkeepers, investments, and service providers, and remove imprudent ones. *Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1828 (2015); 29 U.S.C. §1104(a)(1)(A) (fiduciary duty includes "defraying reasonable expenses of administering the plan"); 29 C.F.R. § 2250.404a-1(b)(i) (ERISA fiduciary must give "appropriate consideration to those facts and circumstances" that "are relevant to the particular investment.") It is for good reason that ERISA requires fiduciaries to be cost-conscious:

> Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan, *Tibble,* 135 S. Ct. at 1826, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.

*Sweda v. Univ. of Pa*., 923 F.3d 320, 328 (3d Cir. 2019).

6.     Defendants Infinity Healthcare, Inc. ("Infinity Healthcare"), the Board of Directors of Infinity Healthcare, Inc. ("Board Defendants"), and John Does 1-30 (collectively, "ERISA Defendants"), are ERISA fiduciaries as they exercises discretionary authority or discretionary control over the 401(k) defined contribution pension plan - known as the Infinity Healthcare, Inc. Employees' Flexible Profit Sharing Plan ("the Plan") - that it sponsored and provided to its employees between July 2014 and March 2019.

7.     Plaintiff alleges that during the putative Class Period (August 7, 2014 through the date of judgment), ERISA Defendants, as fiduciaries of the Plan, as that term is defined under ERISA, 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiff, and to the other participants of the Plan by, among other things: (1) authorizing the Plan to pay unreasonably high fees for recordkeeping and administration (RK&A); and (2) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost.

8.     These unreasonable RK&A fees, investment selections, and service provider selections, cannot be justified.   ERISA Defendants' failure to monitor and improve the recordkeeper, investment options, and investment advisors and consultants, confirms more than simply sloppy business practice. ERISA Defendants' failures breached the fiduciary duties they owed to Plaintiff, Plan participants and beneficiaries. Prudent fiduciaries of 401(k) plans continuously monitor fees against applicable peer groups to identify unreasonable and unjustifiable fees.  The state of the Plan suggests that ERISA Defendants did not engage in a prudent decision-making process and/or engaged in self-dealing, as there is no other explanation

for why the Plan paid these unreasonable fees for RK&A, investment management, and investment advisory and consultant services.

9.      To remedy, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce ERISA Defendants' liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from their breaches of fiduciary duty.

## JURISDICTION AND VENUE

10.      This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under the FLSA, 29 U.S.C. §§ 201, *et seq.*  This Court also has subject matter jurisdiction in this ERISA matter pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 et seq.

11.      This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over the state law claims, Wisconsin's Wage Payment and Collection Laws, Wis. Stat. § 109.01 *et seq*., Wis. Stat. § 104.01 *et seq*., Wis. Stat. § 103.001 *et seq.,* Wis. Admin. Code § DWD 274.01 *et seq*., and Wis. Admin. Code § DWD 272.001 *et seq*., because they are so related in this action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

12.      This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

13.      Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) and (c), because Defendants do business, and have substantial and systematic contacts, in this District.

## PARTIES AND COVERAGE

14.     Plaintiff, Amanda Lange, is an adult female resident of the State of Wisconsin with a post office address of 1235 Taft Avenue, Eau Claire, Wisconsin 54701.  During the Class Period, she was a participant in the Plan under 29 U.S.C. § 1002(7).

15.     Plaintiff has standing to bring this action on behalf of the Plan because she participated in the Plan and was injured by ERISA Defendants' unlawful conduct.

16.     The named Plaintiff and all Participants in the Plan suffered ongoing financial harm as a result of ERISA Defendant's continued imprudent and unreasonable investment and fee decisions made with regard to the Plan.

17.     The named Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the RK&A fees, investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of other service providers) necessary to understand that ERISA Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

18.     The named Plaintiff and all participants in the Plan, having never managed a large 401(k) plan such as the Plan, lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.

19.     Defendant, Infinity Healthcare Physicians, S.C., ("Infinity Physician") was, at all material times herein, an entity doing business in the State of Wisconsin with a principal office address of 111 East Wisconsin Avenue, Suite 2100, Milwaukee, Wisconsin 53202.

20. Defendant, Infinity Healthcare, Inc., ("Infinity Healthcare") was, at all material times herein, an entity doing business in the State of Wisconsin with a principal office address of 111 East Wisconsin Avenue, Suite 2100, Milwaukee, Wisconsin 53202. In this Complaint, "Infinity Healthcare" refers to the named defendant and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.  Infinity Healthcare is an Envision Physician Services Affiliate.

21. Infinity Healthcare is a multispecialty medical group practice specializing in Emergency  Medicine, Anesthesiology, Hospitalist  Services, Radiology,  and  Imaging Services, Wound Care/HBO, Telemedicine, and Occupational Medicine. It currently provides staffing and management services to 28 hospitals in Wisconsin and Illinois.

22. Infinity Healthcare is both the Plan sponsor and the Plan Administrator of the Infinity Healthcare Employees' Flexible Profit Sharing Plan.

23. As the Plan Administrator, Infinity Healthcare is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A).  It has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a). Infinity Healthcare has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

24. Infinity Healthcare acted through its officers, including the Board Defendants, and their members, John Does 1-10, to perform Plan-related fiduciary functions in the course and scope of their business.  For these reasons, Infinity Healthcare is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

25.     Infinity Healthcare in its Plan Administrator capacity, as well as individuals who carried out Plan functions (John Does 11-20), are collectively referred to herein as the "Plan Administrator Defendants."

26.     To the extent that there are additional officers and employees of Infinity Healthcare who are/were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Infinity Healthcare officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

27.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Defendant Infinity Physician maintained a national corporate office address of 7700 West Sunrise Boulevard, Plantation, Florida 33322.

28.     Defendant Infinity Physician is a medical group and wholly-owned subsidiary of Infinity Healthcare, Inc., which is an affiliate of Envision Physicians Services, LLC.

29.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Defendant Infinity Physician's employees performed compensable work at physical locations, such as hospitals, medical centers, clinics, and care facilities, throughout the States of Illinois and Wisconsin.

30.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Plaintiff performed compensable work on Defendant Infinity Physician's behalf, at Defendant Infinity Physician s direction, for Defendant Infinity Physician's benefit, and/or with

Defendant Infinity Physician's knowledge at "HSHS Sacred Heart Hospital" in Eau Claire, Wisconsin, located at 900 West Clairemont Avenue, Eau Claire, Wisconsin 54701.

31.     For purposes of the FLSA, Defendant Infinity Physician was an "employer" of an "employee," Plaintiff, as those terms are used in 29 U.S.C. §§ 203(d) and (e).

32.     For purposes of the WWPCL, Defendant Infinity Physician was an "employer" of Plaintiff, and Plaintiff was "employed" by Defendant Infinity Physician, as those terms, or variations thereof, are used in Wis. Stat. §§ 109.01 *et seq.*, 103.01 *et seq.*, 104.01 *et seq.*, and Wis. Admin. Code § DWD 272.01.

33.     During the relevant time periods as stated herein, Defendant Infinity Physician was engaged in "commerce" and/or its employees were engaged in "commerce," as that term is defined under the FLSA.

34.     During the relevant time periods as stated herein, Defendant Infinity Physician employed more than two (2) employees.

35.     During the relevant time periods as stated herein, Defendant Infinity Physician's annual dollar volume of sales or business exceeded $500,000.

36.     During the relevant time periods as stated herein, Plaintiff was engaged in commerce or in the production of goods for commerce.

37.     Plaintiff's Notice of Consent to Join this collective action pursuant to 29 U.S.C. § 216(b) is contemporaneously filed with this Complaint (ECF No. 1).

38.     Plaintiff brings this action on behalf of herself and all other similarly-situated hourly-paid, non-exempt employees employed by Defendant Infinity Physician within the three (3) years immediately preceding the filing of this Complaint (ECF No. 1). Plaintiff and all other

hourly-paid, non-exempt employees performed similar job duties and were subjected to Defendant Infinity Physician's same unlawful policies as enumerated herein.

39.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Plaintiff and all other hourly-paid, non-exempt employees on whose behalf Plaintiff brings this Complaint performed compensable work on Defendant Infinity Physician's behalf, at Defendant Infinity Physician's direction, for Defendant Infinity Physician's benefit, and/or with Defendant Infinity Physician's knowledge at hospitals, medical centers, clinics, and care facilities, throughout the States of Illinois and Wisconsin.

40.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Defendant Infinity Physician supervised Plaintiff's and all other hourly-paid, non-exempt employees' day-to-day activities.

41.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Defendant Infinity Physician hired, terminated, promoted, demoted, and suspended Plaintiff and all other hourly-paid, non-exempt employees.

42.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Defendant Infinity Physician reviewed Plaintiff's work performance and the work performance of all other hourly-paid, non-exempt employees.

43.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Defendant Infinity Physician established Plaintiff's and all other hourly-paid, non-exempt employees' work schedules and provided Plaintiff and all other hourly-paid, non-exempt employees with work assignments and hours of work.

44.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Defendant Infinity Physician established the terms, conditions, work rules, policies,

and procedures by which Plaintiff and all other hourly-paid, non-exempt employees abided in the workplace.

45.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Defendant Infinity Physician oversaw, managed, and adjudicated Plaintiff's and all other hourly-paid, non-exempt employees' employment-related questions, benefits-related questions, and workplace issues.

46.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Defendant Infinity Physician compensated Plaintiff and all other hourly-paid, non-exempt employees for hours worked and/or work performed, including with additional forms of compensation, such as monetary bonuses, shift differentials, incentives, awards, special project pay, urgent care pay, emergency department pay, wound care pay, stipends, and/or other rewards and payments.

## FLSA AND WWPCL ALLEGATIONS

47.     In approximately November 2012, Defendant Infinity Physician hired Plaintiff as an hourly-paid, non-exempt Physician Assistant to work at "HSHS Sacred Heart Hospital" in Eau Claire, Wisconsin, located at 900 West Clairemont Avenue, Eau Claire, Wisconsin 54701.

48.     During Plaintiff's employment with Defendant Infinity Physician, Plaintiff performed compensable work on Defendant Infinity Physician's behalf, with Defendant Infinity Physician's knowledge, for Defendant Infinity Physician's benefit, and/or at Defendant Infinity Physician's direction in the position of Physician Assistant at "HSHS Sacred Heart Hospital" in Eau Claire, Wisconsin, located at 900 West Clairemont Avenue, Eau Claire, Wisconsin 54701.

49.     Plaintiff is still currently employed by Defendant Infinity Physician.

50.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Plaintiff and all other hourly-paid, non-exempt employees were employed by Defendant Infinity Physician in hourly-paid, non-exempt job positions and performed compensable work on Defendant Infinity Physician's behalf, with Defendant Infinity Physician's knowledge, for Defendant Infinity Physician's benefit, and/or at Defendant Infinity Physician's direction at hospitals, medical centers, clinics, and care facilities, throughout the States of Illinois and Wisconsin.

51.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Defendant Infinity Physician maintained employment records and other documentation regarding Plaintiff and all other hourly-paid, non-exempt employees.

52.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Defendant Infinity Physician maintained a centralized system for tracking and/or recording hours worked by Plaintiff and all other hourly-paid, non-exempt employees.

53.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Defendant Infinity Physician maintained a centralized system for compensating Plaintiff and all other hourly-paid, non-exempt employees for all remuneration earned.

54.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Plaintiff and all other hourly-paid, non-exempt employees frequently worked in excess of forty (40) hours per workweek.

55.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Defendant Infinity Physician knew or had knowledge that Plaintiff and all other hourly-paid, non-exempt employees frequently worked in excess of forty (40) hours per workweek.

56.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Defendant Infinity Physician tracked and/or recorded Plaintiff's and all other hourly-paid, non-exempt employees' hours worked each workweek.

57.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1) and primarily during the calendar year 2018, Defendant Infinity Physician compensated Plaintiff and all other hourly-paid, non-exempt employees on a monthly basis via paycheck.

58.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1) and primarily during the calendar years 2019 and 2020, Defendant Infinity Physician compensated Plaintiff and all other hourly-paid, non-exempt employees on a semi-monthly basis via paycheck.

59.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1) and on a daily, weekly, and/or bi-weekly basis, Plaintiff and all other hourly-paid, non-exempt employees earned and were compensated with monetary bonuses, shift differentials, incentives, awards, special project pay, urgent care pay, emergency department pay, wound care pay, stipends, and/or other rewards and payments based on their hours worked or work performed during their employment with Defendant Infinity Physician.

60.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Plaintiff and all other hourly-paid, non-exempt employees were subject to Defendant Infinity Physician's same unlawful policy, practice, custom, and/or scheme of failing to include all forms of non-discretionary compensation, such as monetary bonuses, shift differentials, incentives, awards, special project pay, urgent care pay, emergency department pay,

wound care pay, stipends, and/or other rewards and payments, in their regular rates of pay for overtime purposes in violation of the FLSA and WWPCL.

61.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Plaintiff and all other hourly-paid, non-exempt employees employed by Defendant Infinity Physician were legally entitled to overtime pay for all hours worked in excess of forty (40) in a workweek.

62.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Defendant Infinity Physician's policies in practice failed to compensate Plaintiff and all other hourly-paid, non-exempt employees for all hours worked each workweek, including but not limited to at the correct and lawful overtime rate of pay for all hours worked and work performed in excess of forty (40) hours in a workweek.

63.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Defendant Infinity Physician's unlawful pay practices as described herein resulted in Plaintiff and all other hourly-paid, non-exempt employees being deprived compensation for all hours worked each workweek, including but not limited to overtime pay for all hours worked in excess of forty (40) in a workweek.

64.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Defendant Infinity Physician was or should have been aware that its policies in practice did not properly and lawfully compensate Plaintiff and all other hourly-paid, non-exempt employees for  all hours worked each workweek, including but not limited to at the correct and lawful overtime rate of pay for all hours worked in excess of forty (40) in a workweek.

**COLLECTIVE ACTION ALLEGATIONS UNDER THE FLSA**

65.     Plaintiff brings this action on behalf of herself and all other similarly situated

employees as authorized under the FLSA, 29 U.S.C. § 216(b).  The similarly situated employees

include:

> All current and former hourly-paid, non-exempt employees
> employed by Defendant Infinity Physician within the three
> (3) years immediately preceding the filing of this
> Complaint (ECF No. 1) who have not been compensated
> for all hours worked in excess of forty (40) hours in a
> workweek at the proper, correct, and/or lawful overtime
> rate of pay as a result of Defendant Infinity Physician's
> failure to include all forms of non-discretionary
> compensation in said employees' regular rates of pay for
> overtime calculation purposes.

66.     Plaintiff and the FLSA Collective primarily performed non-exempt job duties

each workweek and, thus, were legally entitled to overtime pay for all hours worked in excess of

forty (40) in a workweek.

67.     Plaintiff and the FLSA Collective were compensated on an hourly basis (and not

on a salary basis) each workweek and, thus, were legally entitled to overtime pay for all hours

worked in excess of forty (40) in a workweek.

68.     During the three (3) years immediately preceding the filing of this Complaint

(ECF No. 1), Defendant Infinity Physician compensated Plaintiff and the FLSA Collective with,

in addition to an hourly or regular rate(s) of pay, other forms of non-discretionary compensation

– such as performance-based and/or attendance-based monetary bonuses, shift differentials,

incentives, awards, special project pay, urgent care pay, emergency department pay, wound care

pay, stipends, and/or other rewards and payments – on a daily, weekly, bi-weekly, monthly,

quarterly, and/or annual basis.

69.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), the monetary compensation that Defendant Infinity Physician provided to Plaintiff and the FLSA Collective was non-discretionary in nature: it was made pursuant to a known plan (performance or productivity) or formula and/or were announced and known to Plaintiff and the FLSA Collective to encourage and/or reward their steady, rapid, productive, reliable, safe, consistent, regular, predictable, continued, and/or efficient work performance and/or hours worked.

70.     During the three (3) years immediately preceding the filing of this Complaint (ECF No. 1), Defendant Infinity Physician's pay practices failed to include all forms of non-discretionary compensation, such as monetary bonuses, shift differentials, incentives, awards, special project pay, urgent care pay, emergency department pay, wound care pay, stipends, and/or other rewards and payments, in Plaintiff's and the FLSA Collective's regular rate(s) of pay for overtime calculation and compensation purposes during workweeks when said employees worked more than forty (40) hours during the representative time period.

71.     Defendant Infinity Physician's deliberate failure to properly compensate Plaintiff and the FLSA Collective in such a fashion as described in the aforementioned paragraphs violated federal law as set forth in the FLSA.

72.     Defendant Infinity Physician's unlawful practice as it relates to non-discretionary compensation described herein failed to compensate and deprived Plaintiff and the FLSA Collective of the appropriate and lawful overtime wages and compensation due and owing to them, in violation of the FLSA.

73.     Defendant Infinity Physician was or should have been aware that its unlawful practice as it relates to non-discretionary compensation failed to compensate and deprived

Plaintiff and the FLSA Collective of the appropriate and lawful overtime wages and compensation due and owing to them, in violation of the FLSA.

74.     Plaintiff's FLSA Cause of Action is brought under and maintained as an opt-in Collective Action Pursuant to Section 216(b) of the FLSA, 29 U.S.C. § 216(b), on behalf of the FLSA Collective, and this Cause of Action may be pursued by those who affirmatively opt in to this case, pursuant to 29 U.S.C. § 216(b).

75.     Plaintiff and the FLSA Collective are and have been similarly situated, have and have had substantially similar job requirements, and/or pay provisions, and are and have been subject to Defendant Infinity Physician's decisions, policies, plans and programs, practices, procedures, protocols, routines, and rules willfully failing and refusing to compensate them properly and lawfully with overtime compensation. Plaintiff's claims and causes of action as stated herein are the same as those of the FLSA Collective.

76.     Plaintiff and the FLSA Collective seek relief on a collective basis challenging, among any other FLSA violations, Defendant Infinity Physician's practice of failing to include all forms of non-discretionary compensation in the FLSA Collective's regular rates of pay for overtime compensation and calculation purposes.

77.     The FLSA Collective is readily ascertainable. For purpose of notice and other purposes related to this action, the names, phone numbers, and addresses are readily available from Defendant Infinity Physician. Notice can be provided to the FLSA Collective via first class mail to the last address known by Defendant Infinity Physician and through posting at Defendant Infinity Physician's locations in areas where postings are normally made.

78.     Defendant Infinity Physician's conduct, as set forth in this Complaint, was willful and in bad faith, and has caused significant damages to Plaintiff and the FLSA Collective.

## RULE 23 CLASS ALLEGATIONS – WISCONSIN

79.     Plaintiff brings this action on behalf of herself and all other similarly situated employees pursuant to the WWPCL, under Fed. R. Civ. P. 23.  The similarly situated employees include:

> All current and former hourly-paid, non-exempt employees employed by Defendant Infinity Physician in the State of Wisconsin within the two (2) years immediately preceding the filing of this Complaint (ECF No. 1) who have not been compensated for all hours worked in excess of forty (40) hours in a workweek at the proper, correct, and/or lawful overtime rate of pay as a result of Defendant Infinity Physician's failure to include all forms of non-discretionary compensation in said employees' regular rates of pay for overtime calculation purposes.

80.     The Wisconsin Class members are readily ascertainable. The number and identity of the Wisconsin Class members are determinable from the records of Defendant Infinity Physician. The job titles, length of employment, and the rates of pay for the Wisconsin Class members are also determinable from Defendant Infinity Physician's records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendant Infinity Physician. Notice can be provided by means permissible under Fed. R. Civ. P. 23.

81.     The proposed Wisconsin Class is so numerous that joinder of all members is impracticable, and more importantly the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown, upon information and belief, there are over one hundred (100) members of the Wisconsin Class.

82.     Plaintiff's claims are typical of those claims which could be alleged by any member of the Wisconsin Class, and the relief sought is typical of the relief which would be sought by each member of the Wisconsin Class in separate actions. All of the Wisconsin Class

members were subject to the same corporate practices of Defendant Infinity Physician, as alleged herein. Defendant Infinity Physician's corporate-wide policies and practices affected all Wisconsin Class members similarly, and Defendant Infinity Physician benefited from the same type of unfair and/or wrongful acts as to each Wisconsin Class member. Plaintiff and other Wisconsin Class members sustained similar losses, injuries and damages arising from the same unlawful policies, practices and procedures.

83.     Plaintiff is able to fairly and adequately protect the interests of the Wisconsin Class and has no interests antagonistic to the Wisconsin Class. Plaintiff is represented by counsel who is experienced and competent in both collective/class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

84.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit a number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. Because the losses, injuries and damages suffered by each of the individual Wisconsin Class members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Wisconsin Class members to redress the wrongs done to them.

85.     Important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a

significant saving of these costs. The prosecution of separate actions by individual members of the Wisconsin Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Wisconsin Class, establishing incompatible standards of conduct for Defendant and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

86.     Defendant Infinity Physician has violated the WWPCL regarding payment of wages and overtime premium wages. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the Complaint a degree of anonymity which allows for the vindication of their rights while eliminating or reducing these risks.

87.     There are questions of fact and law common to the Wisconsin Class that predominate over any questions affecting only individual members. The questions of law and fact common to the Wisconsin Class arising from Defendant Infinity Physician's actions include, without limitation, the following: (a) Whether Defendant Infinity Physician provided the Wisconsin Class with forms of non-discretionary compensation; (b) Whether Defendant Infinity Physician maintained an unlawful compensation system that failed to include these forms of non-discretionary compensation in current and former hourly-paid, non-exempt employees' regular

rates of pay for overtime calculation purposes; and (c) The nature and extent of class-wide injury and the measure of damages for the injury.

88.    The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness and equity, to other available methods for the fair and efficient adjudication of the state law claims.

## ERISA'S FIDUCIARY STANDARDS

89.    ERISA imposes strict fiduciary standards of loyalty and prudence on ERISA Defendants as a Plan Fiduciaries. 29 U.S.C. § 1104(a)(1) provides in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)    for the exclusive purpose of:
>
> (i)    providing benefits to participants and their beneficiaries; and
> (ii)    defraying reasonable expenses of administering the plan; [and]
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

90.    With certain exceptions not relevant here, 29 U.S.C. § 1103(c)(1) provides in relevant part:

> [T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

91.    29 U.S.C. § 1109 provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

92.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and for the exclusive benefit of participants in the plan, and not for the benefit of third parties including service providers to the plan such as recordkeepers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

93.    "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.,* 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros v. Cody*, 744 F.2d 270, 279 (2nd Cir. 1984) (fiduciaries must use "the appropriate methods to investigate the merits" of plan investments). Fiduciaries must "initially determine, and continue to monitor, the prudence of each investment option available to Plan participants." *DiFelice v. U.S. Airways, Inc*., 497 F.3d 410, 423 (4th Cir. 2007); (emphasis original); 29 C.F.R. § 2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv. Opinion 88-16A. Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones." *Tibble,* 135 S. Ct. at 1828-29.

94.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act § 7.

95.     29 U.S.C. § 1132(a)(2) authorizes Plan participants to bring a civil action for appropriate relief under 29 U.S.C. § 1109.

### ERISA CLAIMS BACKGROUND: DEFINED CONTRIBUTION INDUSTRY

96.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under the plan. Among many options, employers may make contributions on behalf of all employees and/or make matching contributions based on the employees' elective deferrals.  Employees with money in the plan are referred to as participants.

**Recordkeeping and Related Administrative Services**

97.     Recordkeeping and related administrative ("RK&A") services are necessary for all defined contribution plans. These services include, but are not limited to, those related to maintaining plan records, tracking participant account balances and investment elections, transaction processing, call center support, participant communications, and trust and custody services.

98.     Third-party service providers, often known as "recordkeepers," provide RK&A services on behalf of a defined contribution plan. Some recordkeepers provide only recordkeeping and related services and some recordkeepers are subsidiaries of financial services and insurance companies that distribute mutual funds, insurance products, and other investment options.

99.     The market for defined contribution recordkeeping services is highly competitive, particularly for a Plain like ERISA Defendants' with large numbers of participants and large amounts of assets.

100.    Since at least the mid-2000s, the market rate that Plan Fiduciaries have paid for fees for RK&A services has decreased.

101.    The underlying cost to a recordkeeper of providing the RK&A services to a defined contribution plan is primarily dependent on the number of participant accounts in the plan rather than the amount of assets in the plan.

102.    The incremental cost for a recordkeeper to provide RK&A services for a participant's account does not materially differ from one participant to another and is generally not dependent on the balance of the participant's account.

103.    Recordkeepers for relatively larger defined contribution plans, like the Plan here, experience certain efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants increase because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans. When the number of participants with an account balance increases in a defined contribution plan, the recordkeeper is able to spread the cost of providing recordkeeping services over a larger participant base, thereby reducing the unit cost of delivering services on a per-participant basis.

104.    Therefore, while the total cost to a provider for RK&A services increases as more participants join the plan, the cost per participant to deliver the services decreases.

105.    Since at least the early 2000s, Plan Fiduciaries and their consultants and advisors have been aware of this cost structure dynamic for RK&A providers.

106. Since at least the early 2000s, ERISA Defendants were aware of this cost structure dynamic for RK&A providers.

107. Sponsors of defined contribution plans contract for RK&A services separately from any contracts related to the provision of investment management services to Plan Participants.

108. The investment options selected by Plan Fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping services that the recordkeeper provides on behalf of the investment manager, e.g., RK&A services.

109. As a result, RK&A service providers often make separate contractual arrangements with mutual fund providers. RK&A providers then collect a portion of the investment management fees in return for providing services that would otherwise have to be provided by the mutual fund.

110. The fees described in the aforementioned paragraph are known in the defined contribution industry as "revenue sharing."

111. For example, if a mutual fund has a total expense ratio of 0.75%, the mutual fund provider may agree to pay the RK&A provider 0.25% of the 0.75% fee that is paid by the investor in that mutual fund (in this context the Plan Participant). That 0.25% portion of the 0.75% fee is known as the "revenue sharing."

112. In the context of defined contribution plans, the amount of revenue sharing is deemed to be the amount of revenue paid by participants that is allocable to RK&A services and, in some cases, other services provided to the plan. The difference between the total expense ratio and the revenue sharing is known as the "net investment management fee" or the "net investment expense."

113.    In the context of defined contribution plans, when a plan adopts prudent and best practices, the net investment expense is the actual amount a Plan Participant pays for the investment management services provided by a portfolio manager.

114.    Providers of Retirement Plan Services, including RK&A services, typically collect their fees through direct payments from the plan or through indirect compensation such as revenue sharing, or some combination of both.

115.    Regardless of the pricing structure that the Plan Fiduciary negotiates with the recordkeeper, the amount of compensation paid to the recordkeeper for the RK&A services must be reasonable.

116.    As a result, Plan Fiduciaries must understand the total dollar amounts paid to their RK&A provider and be able to determine whether the compensation is reasonable by understanding what the market is for the RK&A services received by the Plan.

117.    Because RK&A fees are actually paid in dollars and because of the cost dynamic noted in the aforementioned paragraphs, the fees paid for RK&A services are evaluated and compared on a dollar per participant basis.

118.    It is well known among retirement plan consultants and advisors (who often act as co-fiduciaries to the Plan Fiduciaries) that, all else being equal, a plan with more participants can and will receive a lower effective per participant fees when evaluated on a per participant basis.

119.    During the Class Period, ERISA Defendants knew and/or were aware that a plan with more participants can and will receive a lower effective per participant fee when evaluated on a per participant basis.

120.    During the Class Period, ERISA Defendants knew and/or were aware that the Plan could and would receive a lower effective per participant fee when evaluated on a per

participant basis.

121.    Plan Fiduciaries of a defined contribution plan have a continuing and regular responsibility to select and monitor all investment options they make available to Plan Participants.

**Investments**

122.    The primary purpose in selecting plan investments is to give all participants the opportunity to create an appropriate asset allocation under modern portfolio theory by providing diversified investment alternatives.

123.    In selecting different investment options to make available to Plan Participants, the Plan Fiduciaries are held to the prudent investor standard when choosing investment managers or, alternatively, choosing index investment options. When choosing an active investment option, the analysis is focused on determining whether the portfolio manager is likely to outperform an appropriate benchmark.

124.    Accordingly, the primary focus when choosing an active investment option to make available to Plan Participants is the skill of the portfolio manager. In many cases a plan sponsor can receive the investment management services of the same portfolio manager through different share classes. When the same investment management services are provided through a mutual fund with different share classes, the fee paid to the portfolio manager is the same for all share classes. The difference in the share class fees is the amount of additional fees which can be used to pay for, among other things, RK&A services.

125.    A Plan Fiduciary choosing a more expensive way to provide identical services of the same portfolio manager must have a rational and informed reason. The Plan Fiduciaries must make an explicit finding that the more expensive option is in the best interest of Plan Participants.

## THE PLAN

126.    The Plan had about $136,482,982 in assets on average between the years 2014 to 2018 entrusted to the care of the Plan's fiduciaries. During the Class Period (from August 7, 2014 through the date of judgment), ERISA Defendants maintained an investment platform that contained about 36 different investment choices to its participants, including 10 Target Date Funds, 23 other actively managed funds, 3 index funds, one stable value fund, and a Schwab self-directed brokerage account.

127.    At all relevant times, the Plan's fees were excessive when compared with other comparable 401(k) and 403(b) plans offered by other sponsors with similar numbers of Plan Participants during this same time period and with similar amounts of money under management.

128.    At all relevant times, the Plan's excessive fees led to lower net returns than participants enjoyed in comparable 401(k) and 403(b) plans offered by other sponsors with similar numbers of Plan Participants during this same time period and with similar amounts of money under management.

129.    During the Class Period, ERISA Defendants breached their duties owed to the Plan, to Plaintiff, and to all other Plan Participants, by: (1) failing to objectively, reasonably, and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) unreasonably maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories. ERISA Defendants also failed to use the lowest cost share class or lower cost collective trusts for many of the mutual funds within the Plan.

130.     ERISA Defendants' mismanagement of the Plan, to the detriment of Plan Participants and beneficiaries, breached the fiduciary duties of prudence and loyalty in violation of 29 U.S.C. § 1104.

131.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") provides that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

132.     As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING RECORDKEEPERS

133.     A Plan Fiduciary is required to fully understand all sources of revenue received by its RK&A service provider/recordkeeper. It must regularly monitor that revenue to ensure that the compensation received by the recordkeeper is and remains reasonable for the services provided.

134.     Prudent Plan Fiduciaries ensure they are paying only reasonable fees for RK&A services by soliciting competitive bids from other service providers to perform the same services currently being provided to the plan. This is not a difficult process and is performed regularly by

Plan Fiduciaries. Plan Fiduciaries need only request a bid from salespeople at other service providers. For plans with as many participants as Defendants' Plan, most recordkeepers would require only the number of participants and the amount of the assets to provide a quote while others might only require the number of participants.

135.    Prudent Plan Fiduciaries have all of this information readily available and can easily receive a quote from other service providers to determine if the current level of fees is reasonable.

136.    Having received bids, the prudent Plan Fiduciary can negotiate with its current provider for a lower fee and/or move to a new provider to provide the same (or better) services for a competitive reasonable fee.

137.    Prudent Plan Fiduciaries can follow this same process for retirement plan advisors and/or consultants as well as any other covered service providers.

138.    A prudent Plan Fiduciary uses a per-participant revenue requirement pricing structure. Under this structure, the Plan Fiduciary and service provider negotiate a fixed per participant threshold. In other words, the recordkeeper's fee for providing RK&A services is a fixed amount per participant, e.g., $45.00 per participant. For example, according to the DC Callan Trend Surveys, "Explicit per participant dollar fee," the following percentage of plans were charged on a per-participant basis for the following calendar years:  (1) for the year 2016:  41.6% of plans were charged on a per-participant basis; (2) for the year 2017: 54.7% of plans were charged on a per-participant basis; (3) for the year 2018: 63.8% of plans were charged on a per-participant basis; and (4) for the year 2019: 64.9% of plans were charged on a per-participant basis.

139.     After the revenue requirement is negotiated, the Plan Fiduciary determines how to pay the negotiated RK&A fee. The employer/plan sponsor can pay the recordkeeping fee on behalf of participants, which is the most beneficial to Plan Participants. If the employer were paying the fee, the employer would have an interest in negotiating the lowest fee a suitable recordkeeper would accept. Usually, however, the employer decides to have the Plan (Plan Participants) pay the recordkeeping fee instead. If the recordkeeping fee is paid by Plan Participants, the Plan Fiduciary can allocate the negotiated recordkeeping fee among participant accounts at the negotiated per-participant rate, or pro-rata based on account values, among other less common ways.

140.     In other words, if the Plan negotiates a per participant revenue threshold, e.g., $45.00, the plan does not need to require that each participant pay $45.00. Rather, the Plan Fiduciary could determine that an asset-based fee is more appropriate for Plan Participants and allocate the RK&A fee pro rata to participants. For example, a 10,000-participant plan with a $45.00 revenue threshold would pay $450,000 for RK&A services. If the plan had $450,000,000 in assets, then the $450,000 would work out to 10 basis points. Accordingly, the Plan Fiduciary could allocate the $450,000 to Plan Participants by requiring that each participant pay 10 basis points.

141.     In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the plan. This structure creates situations in which the services provided by the recordkeeper do not change but, because of market appreciation and contributions to the plan, the revenue received by the recordkeeper increases. This structure was historically preferred by recordkeepers because it allowed recordkeepers to obtain an increase in revenue without having to ask the client to pay a higher

fee.

142.    Regardless of the pricing structure negotiated by the Plan Fiduciary, the Plan Fiduciary must ensure that the fee paid to the recordkeeper is reasonable for the level of services provided.

143.    All of these standards were accepted and understood by Plan Fiduciaries, including ERISA Defendants, at all times during the Class Period.

144.    For example, fiduciary best practices based on DOL guidelines, case law, and marketplace experience are as follows:

> 1. Price administrative fees on a per-participant basis.
>
> 2. Benchmark and negotiate recordkeeping and investment fees separately.
>
> 3. Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size.
>
> 4. Benchmark and negotiate recordkeeping and trustee fees at least every other year. . . .
>
> 7. Review services annually to identify opportunities to reduce administrative costs.[2]

145.    The recordkeeper during the Class Period, Great-West Life & Annuity ("Great-West"), is well known as a high cost recordkeeper and administrator and tends to have platforms that encourage higher fee funds.

146.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.,* 746 F.3d 327, 336 (8th Cir. 2014) (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan); *George v. Kraft Foods Glob.,*

---

[2] "Fiduciary Best Practices," *DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer Investment Consulting (2013).

Inc., 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution Plan Fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

147.   First, a Plan Fiduciary must pay close attention to the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

148.   Second, to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

149.   Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three (3) to five (5) years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans.

## THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR RK&A FEES AND, AS A RESULT, THE PLAN PAID UNREASONABLE RK&A FEES

150.    A Plan Fiduciary must continuously monitor its RK&A fees by regularly soliciting competitive bids to ensure fees paid to covered service providers (such as recordkeepers) are reasonable.

151.    During the Class Period, ERISA Defendants knew or should have known that they must regularly monitor the Plan's RK&A fees paid to covered service providers, including but not limited to Great-West.

152.    During the Class Period, ERISA Defendants failed to regularly monitor the Plan's RK&A fees paid to covered service providers, including but not limited to Great-West.

153.    During the Class Period, ERISA Defendants knew or should have known that they must regularly solicit quotes and/or competitive bids from covered service providers, including but not limited to Great-West, in order to avoid paying unreasonable fees for RK&A services.

154.    During the Class Period, ERISA Defendants failed to regularly solicit quotes and/or competitive bids from covered service providers, including but not limited to Great-West, in order to avoid paying unreasonable fees for RK&A services.

155.    During the Class Period, ERISA Defendants knew or should have known that it was in the best interests of the Plan's Participants to ensure that the Plan paid no more than a competitive reasonable fee for RK&A services.

156.    During the Class Period, ERISA Defendants failed to ensure that the Plan paid no more than a competitive reasonable fee for RK&A services.

157.    During the Class Period, ERISA Defendants did not have a plan or process in place to ensure that the Plan paid no more than a competitive reasonable fee for RK&A services.

158.    During the Class Period, ERISA Defendants did not engage in any objectively reasonable and/or prudent efforts to ensure that the Plan paid no more than a competitive reasonable fee for RK&A services.

159.    During the Class Period and because ERISA Defendants failed to regularly monitor the Plan's RK&A fees paid to covered service providers, including but not limited to Great-West, these RK&A service fees were significantly higher than they would have been had ERISA Defendants engaged in this process.

160.    During the Class Period and because ERISA Defendants did not solicit quotes and/or competitive bids from covered service providers, including but not limited to Great-West, before and/or when paying fees for RK&A services, these RK&A service fees were significantly higher than they would have been had ERISA Defendants engaged in these processes.

161.    During the Class Period and because ERISA Defendants did not engage in any objectively reasonable and/or prudent efforts when paying fees for RK&A services to covered service providers, including but not limited to Great-West, these RK&A service fees were significantly higher than they would have been had ERISA Defendants engaged in these efforts.

162.    Specifically, and for example, during the year 2018, the following graph and table illustrate that the Plan's RK&A fees were significantly higher as compared to other 401(k) and 403(b) plans of similar sizes with similar amounts of money under management during this same period of time.



| Plan | Partici-pants | Assets | RK&A Price | RK&A Price /pp | Recordkeeper | Graph Color |
|------|------|------|------|------|------|------|
| MDVIP, LLC 401(K) Plan | 393 | $23,928,301 | $55,187 | $140 | Great-West | Blue |
| Conning & Company (U.S.) Retirement Savings Plan | 398 | $81,718,884 | $54,517 | $137 | Great-West | Blue |
| Priority Ambulance, Llc 401(K) Plan | 434 | $9,069,183 | $57,656 | $133 | Great-West | Blue |
| **Infinity Healthcare, Inc. Employees' Flexible Profit Sharing Plan** | 477 | $136,422,453 | $138,344 | $290 | Great-West | Red |
| Emergency Physicians Professional Association Profit Sharing 401(K) Plan | 508 | $133,704,250 | $69,057 | $136 | Schwab | White |
| Brown Rudnick Llp 401K Profit Sharing Plan A | 508 | $100,407,634 | $29,785 | $59 | Schwab | White |
| Medical Clinic Of Sacramento, Inc. 401(K) Plan | 509 | $260,067,534 | $69,166 | $136 | Great-West | Blue |
| NPI/NRCA Employees Savings And Investment Plan | 548 | $142,585,206 | $57,034 | $104 | Fidelity | White |
| Compass Health, Inc. 401(K) Profit Sharing Plan | 611 | $13,172,474 | $37,127 | $61 | Great-West | Blue |
| HRL Retirement Savings Plan For Non-Bargained Employees | 625 | $155,081,708 | $35,694 | $57 | Vanguard | White |
| The Taubman Company And Related Entities Employee Retirement Savings | 679 | $144,649,416 | $49,446 | $73 | Vanguard | White |

Comparative Plans' RK&A Fees Based on Publicly Available Information from Form 5500[1]

[1] Price calculations are based on 2018 Form 5500

163.   The underlying data and information reflected in the graph and table above are truthful, accurate, and derived from publicly available information, which was equally as available to ERISA Defendants during the Class Period, including the most recent Form 5500 filings and accompanying attachments by ERISA Defendants and the other entities and plans listed therein, some of whom are healthcare companies like ERISA Defendants who used the same recordkeeper, Great-West.

164.     As the above graph and table illustrate, during the year 2018, a reasonable market rate RK&A fee would have been between approximately $100.00 and $130.00 per participant.

165.     As the above graph and table illustrate, during the year 2018, other plans of similar sizes with similar amounts of money under management as compared to the Plan paid recordkeepers an average of approximately $51,467, or approximately $103.60 per participant.

166.     As the above graph and table illustrate, during the year 2018, the Plan paid RK&A fees to Great-West totaling approximately $138,344 or approximately $290.00 per participant, almost three times the amount that other plans of similar sizes with similar amounts of money under management paid to other recordkeepers, including but not limited to ERISA Defendants' same recordkeeper, Great-West, during the year 2018.

167.     During the year 2018, a prudent Plan Fiduciary would not have agreed to pay almost triple what they could otherwise have paid for the same services from, in some instances and as identified in the graph and table above, the exact same covered service provider.

168.     During the year 2018 and had ERISA Defendants been acting in the best interests of the Plan's Participants – and as compared to other plans of similar sizes with similar amounts of money under management as identified in the graph and table above – the Plan actually would have paid less than triple in RK&A fees.

169.     During the entirety of the Class Period, ERISA Defendants did not use its size to bargain or negotiate with covered service providers and recordkeepers, including but not limited to Great-West, to defray or reduce administrative costs and RK&A fees to the Plan's Participants.

170.     During the entirety of the Class Period and because ERISA Defendants did not use its size to bargain or negotiate with covered service providers and recordkeepers, including

but not limited to Great-West,, to defray or reduce administrative costs and RK&A fees to the Plan's Participants, ERISA Defendants acted imprudently and unreasonable.

171.    From the years 2014 to 2018 during the Class Period and based upon the best available truthful, accurate, and publicly available information, which was equally as available to ERISA Defendants during the Class Period, the Plan paid an average amount of at least approximately $170,495 per year in RK&A fees, which equated to an average of at least approximately $348.00 per participant per year, as identified in the following chart:

| Recordkeeping and Administration (RK&A) Fee Details | | | | | | |
|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | Average |
| Est. Conservative RK&A Fees | $181,426 | $164,040 | $172,091 | $196,573 | $138,344 | $170,495 |
| Participants | 448 | 489 | 530 | 511 | 477 | 491 |
| Est. Conservative RK&A Per Participant | $405 | $335 | $325 | $385 | $290 | $348 |

172.    From the years 2014 to 2018 during the Class Period and based upon the best available truthful, accurate, and publicly available information, which was equally as available to ERISA Defendants during the Class Period, had ERISA Defendants been acting in the best interests of the Plan's Participants – and as compared to other plans of similar sizes with similar amounts of money under management – the Plan actually would have paid significantly less than an average of approximately $170,495 per year in RK&A fees, which equated to an average of approximately $348.00 per participant per year.

173.    From the years 2014 to 2018 during the Class Period and based upon the best available truthful, accurate, and publicly available information, which was equally as available to ERISA Defendants during the Class Period, had ERISA Defendants been acting in the best interests of the Plan's Participants – and as compared to other plans of similar sizes with similar amounts of money under management – the Plan actually would have paid a reasonable market rate of approximately $51,467 per year in RK&A fees, which equates to approximately or

approximately $104 per participant per year.

174.    During the entirety of the Class Period, a prudent Plan Fiduciary would not agree to pay almost triple what they could otherwise pay for the same services from, in some instances, the exact same covered service provider.

175.    From the years 2014 to 2018 during the Class Period and based upon the best available truthful, accurate, and publicly available information, which was equally as available to ERISA Defendants during the Class Period, because ERISA Defendants did not act in the best interests of the Plan's Participants – and as compared to other plans of similar sizes with similar amounts of money under management – the Plan actually cost its Participants approximately $119,028 per year in RK&A fees, which equates to approximately $242.00 per participant per year.

176.    From the years 2014 to 2018 during the Class Period and because ERISA Defendants did not act in the best interests of the Plan's Participants – and as compared to other plans of similar sizes with similar amounts of money under management – the Plan actually cost its Participants a total minimum amount of approximately $665,452 in RK&A fees.

177.    During the entirety of the Class Period and based upon the best available truthful, accurate, and publicly available information, which was equally as available to ERISA Defendants during the Class Period, because ERISA Defendants did not act in the best interests of the Plan's Participants – and as compared to other plans of similar sizes with similar amounts of money under management – the Plan actually cost its Participants (when accounting for compounding percentages) a total, cumulative amount in excess of $874,937 in RK&A fees.

178.    During the entirety of the Class Period, ERISA Defendants did not regularly and/or reasonably assess, in any way, the Plan's administrative costs and RK&A fees it paid to

Great-West.

179.    During the entirety of the Class Period, ERISA Defendants did not engage in any regular and/or reasonable examination, comparison, or benchmarking of the Plan's administrative costs and RK&A fees it paid to Great-West vis-à-vis the administrative costs and RK&A fees that other plans of similar sizes with similar amounts of money under management paid to their covered service providers – who, in some instances, was Great-West, the exact same provider as utilized by ERISA Defendants during the entirety of the Class Period.

180.    During the entirety of the Class Period, ERISA Defendants knew or had knowledge that it must engage in regular and/or reasonable examination, comparison, or benchmarking of the Plan's administrative costs and RK&A fees it paid to Great-West, but ERISA Defendants simply failed to do so in any meaningful way whatsoever.

181.    During the entirety of the Class Period and had ERISA Defendants engaged in any regular and/or reasonable examination, comparison, or benchmarking of the Plan's administrative costs and RK&A fees it paid to Great-West, it would have realized and understood that the Plan was compensating Great-West unreasonably and inappropriately for its size and scale, passing these unreasonable and excessive fee burdens to Plaintiff and the Plan Participants

182.    During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher administrative costs and RK&A fees than they should have been and/or by failing to take effective remedial actions as described herein, ERISA Defendants breached their fiduciary duties to Plaintiff and the Plan Participants.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES
## SELECTING & MONITORING INVESTMENT OPTIONS

183.    There is a commonly accepted process to select and monitor investment options which is based on modern portfolio theory and the prudent investor standard. Under ERISA, Plan Fiduciaries are required to engage investment consultants or advisors to the extent that the Plan Fiduciaries do not have the investment expertise necessary to select and monitor investments under modern portfolio theory.

184.    That accepted process involves, among other things, evaluating the performance history, tenure, and stability of the current portfolio manager; the risk adjusted returns; and the fees.

185.    When an active investment option is chosen, one of the most critical aspects of the analysis is to choose a portfolio manager because it is the skill of the portfolio manager that differentially impacts the performance of the investment.

186.    From the perspective of a Plan Participant, the other critical component of the analysis is the fees.  However, the total expense ratio of an investment option is often comprised of multiple different types of fees, only one of which is specifically associated with the fee of the actual portfolio manager.

187.    As a result, a Plan Fiduciary is required to understand the interrelationship between the pricing structure it has negotiated with the recordkeeper for RK&A services as well as the different fee components of the investment options selected to be made available to Plan Participants.

188.    When a Plan Fiduciary can choose among different share classes (or other types of investment options, e.g., collective trusts) to receive the services of a specific portfolio manager, the Plan Fiduciary is required to understand all the fees related to the different share

classes and choose the share class that is in the best interest of the Plan Participants. This is especially critical when the pricing structure provides compensation to the recordkeeper from revenue sharing paid by Plan Participants as part of the total expense ratio of the investment options selected by the Plan Fiduciaries.

189.    If the RK&A pricing structure includes a revenue threshold, then a prudent Plan Fiduciary must choose the share class with the lowest net investment management fee.  If the pricing structure does not include a revenue threshold, then a prudent Plan Fiduciary must ensure that the revenue sharing will not result in the payment of an unreasonable fee to the recordkeeper for the RK&A services.

190.    A prudent Plan Fiduciary must ensure that the combination of the RK&A pricing structure and the selected share classes together provide the best outcome for Plan Participants.

191.    If a Plan Fiduciary chooses an active investment option when an alternative index option is available, the Plan Fiduciary must make a specific and informed finding that the probability that the active portfolio manager will outperform the index warrants the higher fees paid charged by the active portfolio manager and the risk/reward tradeoffs show that the potential of outperformance is in the best interest of Plan Participants.

192.    If a Plan Fiduciary chooses an active investment option when an alternative index option is available, but the Plan Fiduciary does not make a specific and informed finding that the probability that the active portfolio manager will outperform the index (and as such warranting the higher fees paid charged by the active portfolio manager) and the risk/reward tradeoffs show that the potential of outperformance is in the best interest of Plan Participants, the Plan Fiduciary has acted unreasonably and/or imprudently.

193.     In February 2013, the Department of Labor issued guidance for the selection of target date funds in a publication titled, "Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries."[3] Fiduciaries were given specific guidance to: (i) establish a process for comparing and selecting TDFs; (ii) establish a process for the periodic review of TDFs; (iii) understand the fund's investments – the allocation in different asset classes (stocks, bonds, cash), individual investments, and how these will change over time; (iv) inquire about whether a custom or non-proprietary target date fund would be a better fit for a plan; and (v) develop effective employee communications.

194.     The Department of Labor gave a very specific warning about the importance of keeping costs under control: "A difference of just one percentage point in fees (1.5% as compared with 0.5%) over 35 years dramatically affects overall returns. If a worker with a 401(k)-account balance of $25,000 averages a seven percent return, the worker will have $227,000 at retirement with the lower fee and $163,000 with the higher fee, assuming no further contributions."[4]

### THE PLAN PAID UNREASONABLY HIGH FEES FOR SHARE CLASSES

195.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive shares are targeted at small investors with less bargaining power, while lower cost shares are targeted at larger investors with greater assets. There is no material difference between share classes other than costs – the funds hold identical investments and have the same manager.

---

[3]        https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds.pdf
[4]        U.S. Department of Labor, Employee Benefits Security Administration, A Look At 401(k) Plan Fees, at http://www.dol.gov/ebsa/publications/401k_employee.html

196.    Large defined contribution plans such as the Plan have sufficient assets to qualify for lower cost share classes. It is well known among institutional investors that mutual fund companies will waive investment minimums for a large plan.

197.    A prudent Plan Fiduciary uses a plan's asset size and negotiating power to invest in low cost share classes available in the market.

198.    A prudent Plan Fiduciary engages in an objectively reasonable search for and selection of the lowest-priced share classes available in the market.

199.    During the Class Period, ERISA Defendants knew or should have known that it must use its asset size and negotiating power to invest in low cost share classes available in the market.

200.    During the Class Period, ERISA Defendants knew or should have known that it must engage in an objectively reasonable search for and selection of the lowest-priced share classes available in the market.

201.    During the Class Period, ERISA Defendants did not use its asset size and negotiating power to invest in low cost share classes available in the market.

202.    During the Class Period, ERISA Defendants did not engage in an objectively reasonable search for and selection of the lowest-priced share classes available in the market.

203.    The following charts identify ERISA Defendants' share class investments during the Class Period vis-à-vis more prudent, reasonable, and lower share class alternatives during this same time period:

| | Defendants' Investment | | | | | Prudent Alternative Share Class | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Fee (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Fee (%) | Defendants' Investment Excessive Fees (%) |
| JBGIX | Aberdeen Total Return Bond I | 0.44% | 0.05% | 0.39% | BJBGX | Aberdeen Total Return Bond A | 0.69% | 0.35% | 0.34% | 15% |
| DCCIX | Delaware Small Cap Core I | 0.87% | 0.33% | 0.54% | DCCRX | Delaware Small Cap Core R | 1.37% | 0.85% | 0.52% | 4% |
| HNVIX | Heartland Value Plus Inst | 0.95% | 0.25% | 0.70% | HRVIX | Heartland Value Plus Investor | 1.18% | 0.50% | 0.68% | 3% |
| JMGRX | Janus Henderson Enterprise I | 0.75% | 0.10% | 0.65% | JAENX | Janus Henderson Enterprise T | 0.91% | 0.35% | 0.56% | 16% |
| PRILX | Parnassus Core Equity Institutional | 0.63% | 0.10% | 0.53% | PRBLX | Parnassus Core Equity Investor | 0.87% | 0.40% | 0.47% | 13% |
| PRRIX | PIMCO Real Return Instl | 0.98% | 0.00% | 0.98% | PRTCX | PIMCO Real Return C | 1.88% | 1.00% | 0.88% | 11% |
| UBVSX | Undiscovered Managers Behavioral Val I | 1.12% | 0.25% | 0.87% | UBVRX | Undiscovered Managers Behavioral Val R2 | 1.55% | 0.75% | 0.80% | 9% |

204.     The underlying data and information reflected in the charts above are truthful, accurate, and derived from publicly available information, which was equally as available to ERISA Defendants during the Class Period, including but not limited to Plaintiff's Plan quarterly statements, the Plan's Summary Description, and the Plan's fee disclosures.

205.     Based upon data and information reflected in the charts above, the average excessive fee for ERISA Defendants not using a lower-priced, more efficient and/or prudent alternative share class during the Class Period was approximately 10%.

206.     During the Class Period and had ERISA Defendants used its asset size and negotiating power to invest in low cost share classes available in the market, the Plan would not have selected the funds in the "Defendants' Investment" columns of the charts above.

207.     During the Class Period and had ERISA Defendants used its asset size and negotiating power to invest in low cost share classes available in the market, the Plan would have selected the funds in the "Prudent Alternative Share Class" columns of the charts above.

208.     During the Class Period and had ERISA Defendants engaged in an objectively reasonable search for and selection of the lowest-priced share classes available in the market, the

Plan would not have selected the funds in the "Defendants' Investment" columns of the charts above.

209.    During the Class Period and had ERISA Defendants engaged in an objectively reasonable search for and selection of the lowest-priced share classes available in the market, the Plan would have selected the funds in the "Prudent Alternative Share Class" columns of the charts above.

210.    During the Class Period and had ERISA Defendants been acting in the best interests of the Plan's Participants, the Plan would not have selected the funds in the "Defendants' Investment" columns of the charts above.

211.    During the Class Period and had ERISA Defendants been acting in the best interests of the Plan's Participants, the Plan would have selected the funds in the "Prudent Alternative Share Class" columns of the charts above.

212.    During the entirety of the Class Period, ERISA Defendants knew or should have known about the existence of cheaper or lower-cost share classes as identified in the "Prudent Alternative Share Class" columns of the charts above.

213.     During the entirety of the Class Period, ERISA Defendants knew or should have known to transfer the Plan funds into the cheaper or lower-cost share classes as identified in the "Prudent Alternative Share Class" columns of the charts above.

214.    A prudent fiduciary would not select high-cost share classes when lower-cost share classes are available for the same investment.

215.    During the entirety of the Class Period, ERISA Defendants selected higher-cost share classes when lower-cost share classes were available to the Plan for the same investment, to the substantial detriment of Plaintiff and the Plan's Participants.

216.   During the entirety of the Class Period and because ERISA Defendants selected higher-cost share classes when lower-cost share classes were available to the Plan for the same investment, the Plaintiff and the Plan Participants did not receive any additional services or benefits other than a higher cost for Plaintiff and the Plan Participants.

217.   As an example of ERISA Defendants' failure to engage in an objectively reasonable search for and selection of the lowest-priced share classes available in the market during the Class Period, consider the Aberdeen Total Return Bond A (BJBGX) which was selected by the Plan Fiduciaries and made available to participants in the Plan during the entire Class Period. As of year-end 2018, Participants had invested almost $6,500,000 in this investment option.  The portfolio managers of this investment option are Lynn Chen, Svetlin Krastev, and Michael Waggaman. Participants receive the identical investment management services of the portfolio managers through several different investment options (share classes) with different fee structures.  The fee structures for these varying Total Return Bond investment options, all managed by the same portfolio managers, are set forth in the chart below:

| Example of Different Share Class Fee Levels for Identical Investment Management Services | | |
|---|---|---|
| | Aberdeen Total Return Bond A | Aberdeen Total Return Bond I |
| Share Class | A Class | I Class |
| Investment Advisor | Aberdeen | Aberdeen |
| Investment Sub-Advisor | None | None |
| Portfolio Managers | Lynn Chen Svetlin Krastev Michael Waggaman | Lynn Chen Svetlin Krastev Michael Waggaman |
| Ticker | BJBGX | JBGIX |
| Investment Management Fee | 0.35% | 0.35% |
| Total Expense Ratio | 0.69% | 0.44% |
| Actual Revenue Sharing Credit Available | 0.35% | 0.05% |
| Net Investment Expense to Retirement Plans | 0.34% | 0.39% |

218.    The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was equally as available to ERISA Defendants during the Class Period.

219.    Plan Fiduciaries are required under ERISA to understand all the separate components of fees for different types of services charged to the plan and Plan Participants.

220.    The second to last row of the chart above, "Actual Revenue Sharing Credit Available," is simply the mathematical difference between the total expense ratio and the investment management fee rate. Because each investment option negotiates its "revenue sharing" agreement separately with each recordkeeping platform, the revenue sharing rate could be different on different recordkeeping platforms and may also be larger or smaller than the amount indicated in the chart above. Revenue sharing rates are not always disclosed to Plan Participants on the Participant fee disclosure documents and, perhaps worse, are not even always disclosed on the 5500 forms filed by Plan Fiduciaries.

221.    Upon information and belief during the Class Period, the Plan did not use a revenue threshold fee structure in which all revenue sharing was returned to the Plan Participants who generated that revenue. Thus, it would be incorrect to assume that the share class that provided the lowest net investment expense in the chart above provided the most value to the Plan Participants.

222.    As illustrated in the chart above, the fee to receive the exact same investment management skills of the portfolio managers are set forth in the "Investment Management Expense Fee" row is (34 basis points) – except the actual option chosen by the Plan was 5 basis points more expensive (39 basis points).

223.    A Plan Fiduciary selecting either of these investment options identified in the above chart will receive identical portfolio management services performed by the same portfolio manager with the only material difference being the amount of extra fees that are included in the total expense ratio that will be paid by Plan Participants.

224.    As illustrated in the chart below, which is based on the $6,500,000 that the Plan invested in the Aberdeen Total Return Bond A (BJBGX) during the year 2018, because ERISA Defendants did not select cheaper, lower-cost, more prudent share classes available to the Plan and within which to invest the Plan's assets, ERISA Defendants caused substantial monetary damage and detriment to Plaintiff and the Plan's Participants.



* Calculations in above graph based on the $6,474,660 that the Plan invested in
  Aberdeen Total Return Bond I in 2018.

225.    The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was equally as available to ERISA Defendants during the Class Period.

226.    A prudent fiduciary conducting an impartial and objectively reasonable review of the Plan's investments during the Class Period would have conducted a review on at least a quarterly basis, which would have identified cheaper, lower-cost, and/or more prudent share classes available.

227.    A prudent fiduciary conducting an impartial and objectively reasonable review of the Plan's investments during the Class Period would have conducted a review on at least a quarterly basis, would have identified cheaper, lower-cost, and/or more prudent share classes available, and would have transferred the Plan's investments into these cheaper, lower-cost, and/or institutional shares at the earliest opportunity.

228.    During the entirety of the Class Period, ERISA Defendants: did not conduct an impartial and objectively reasonable review of the Plan's investments on at least a quarterly basis; did not identify cheaper, lower-cost, more prudent share classes available to the Plan; and did not transfer the Plan's investments into these cheaper, lower-cost, and/or institutional shares, all to the substantial detriment of Plaintiff and the Plan's Participants.

229.    During the entirety of the Class Period and by failing to recognize that the Plan was invested in higher-cost share classes when lower-cost share classes were available to the Plan for the same investment and/or by failing to take effective remedial actions as described herein, ERISA Defendants breached their fiduciary duties to Plaintiff and the Plan Participants.

## ERISA DEFENDANTS' INVESTMENTS IN THE PLAN

230.    A prudent fiduciary will consider all plan investments, including "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." Restatement (Third) of Trusts § 100 cmt. b(1).

231.    While higher-cost mutual funds may outperform a less-expensive option over the short term, such as a passively managed index fund, they rarely do so over a longer term. See

Jonnelle Marte, Do Any Mutual Funds Ever Beat the Market? Hardly, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutualfunds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices that looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); see also Index funds trounce actively managed funds: Study, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-activelymanaged-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

232.    Funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "When Cheaper is Better"); see also Jill E. Fisch, Rethinking the Regulation of Securities Intermediaries, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

233.    During the Class Period, ERISA Defendants selected and/or made available to the Plan's Participants more than 44 investment options.

234.    Upon information and belief and during the Class Period, the more than 44 investment options that ERISA Defendants selected and/or made available to the Plan's Participants resulted in the Plan's Participants subsidizing the RK&A fees of other Participants.

235.    During the Class Period, the chart below identifies several investment options that ERISA Defendants selected and/or made available to Plan Participants as compared to prudent

alternative and less expensive options. In some instances, the less expensive option provides the identical portfolio management services delivered by the same portfolio manager.

| Defendants' Investment | | | Prudent Alternative Investments | | | |
| Ticker | Fund Name | Exp Ratio (%) | Ticker | Fund Name | Exp Ratio (%) | Defendants' Investment Excessive Fees (%) |
|---|---|---|---|---|---|---|
| JBGIX | Aberdeen Total Return Bond I | 0.44% | FXNAX | Fidelity® US Bond Index Instl Prem | 0.02% | 2100% |
| ACIIX | American Century Equity Income I | 0.72% | FLCOX | Fidelity® Large Cap Value Index Prm Inst | 0.04% | 1957% |
| TWGIX | American Century Growth I | 0.77% | FSPGX | Fidelity® Large Cap Growth Idx Instl Prm | 0.04% | 2100% |
| RFNGX | American Funds Fundamental Invs R6 | 0.30% | FXAIX | Fidelity® 500 Index Institutional Prem | 0.02% | 1900% |
| RGAGX | American Funds Growth Fund of Amer R6 | 0.33% | FSPGX | Fidelity® Large Cap Growth Idx Instl Prm | 0.04% | 843% |
| JBGIX | Artio Total Return Bond I | 0.44% | FXNAX | Fidelity® US Bond Index Instl Prem | 0.03% | 1660% |
| ARTIX | Artisan International Investor | 1.18% | VIAAX | Vanguard Intl Div Apprec Idx Adm | 0.25% | 372% |
| LCOIX | ClearBridge International Sm Cap | 1.07% | DFVQX | DFA International Vector Equity I | 0.48% | 123% |
| ACRNX | Columbia Acorn Fund - Z | 0.86% | VMGMX | Vanguard Mid-Cap Growth Index Admiral | 0.07% | 1129% |
| NAMAX | Columbia Select Mid Cap Value Instl | 0.92% | VMVAX | Vanguard Mid-Cap Value Index Admiral | 0.07% | 1214% |
| SMCEX | Columbia Small Cap Core Z | 1.08% | FSSNX | Fidelity® Small Cap Index Instl Prem | 0.02% | 5300% |
| DCCIX | Delaware Small Cap Core I | 0.87% | FSSNX | Fidelity® Small Cap Index Instl Prem | 0.02% | 4250% |

| Defendants' Investment | | | Prudent Alternative Investments | | | |
|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Ticker | Fund Name | Exp Ratio (%) | Investment Excessive |
| DODFX | Dodge & Cox International Stock | 0.63% | SFNNX | Schwab Fdmtl Intl Lg Co Idx | 0.25% | 152% |
| DODGX | Dodge & Cox Stock | 0.52% | FLCOX | Fidelity® Large Cap Value Index Prm Inst | 0.04% | 1386% |
| FSSAX | Franklin Small Cap Growth Adv | 0.82% | VSGIX | Vanguard Small Cap Growth Index I | 0.06% | 1267% |
| HNVIX | Heartland Value Plus Inst | 0.95% | VSIIX | Vanguard Small Cap Value Index I | 0.06% | 1483% |
| JMGRX | Janus Henderson Enterprise I | 0.75% | VMGMX | Vanguard Mid-Cap Growth Index Admiral | 0.07% | 971% |
| LZOEX | Lazard Emerging Markets Equity Open | 1.32% | FPADX | Fidelity® Emerging Markets Idx Instl Prm | 0.08% | 1550% |
| FARCX | Nuveen Real Estate Securities I | 1.02% | FSRNX | Fidelity® Real Estate Index Instl | 0.07% | 1357% |
| PRILX | Parnassus Core Equity Institutional | 0.63% | FXAIX | Fidelity® 500 Index Institutional Prem | 0.02% | 4100% |
| PRRIX | PIMCO Real Return Instl | 0.98% | VTSPX | Vanguard Shrt-Term Infl-Prot Sec Idx Ins | 0.04% | 2350% |
| PRWCX | T. Rowe Price Capital Appreciation | 0.71% | VBAIX | Vanguard Balanced Index I | 0.06% | 1083% |
| UBVSX | Undiscovered Managers Behavioral Val I | 1.12% | VSIIX | Vanguard Small Cap Value Index I | 0.06% | 1767% |

236.   The underlying data and information reflected in the charts above are truthful, accurate, and derived from publicly available information, which was equally as available to ERISA Defendants during the Class Period, including but not limited to Plaintiff's Plan quarterly statements, the Plan's Summary Description, and the Plan's fee disclosures.

237.   In the charts above, the "expense ratio" refers to a percentage of the Plan's assets that were under management during the Class Period. For example, if a mutual fund share class deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (or bps). (One basis point is equal to 1/100th of one percent (or 0.01%)). The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors.

238.     A prudent fiduciary understands and knows that a fund's "expense ratio" is one of the most – if not the most – important considerations in the fund selection process.

239.     During the Class Period, ERISA Defendants knew or should have known that a fund's "expense ratio" was one of the most – if not the most – important considerations in the fund selection process.

240.     During the Class Period and based upon the underlying data and information in the charts above, the average Plan expense ratio was 0.52%, or 52 basis points.

241.     During the Class Period and based upon the underlying data and information in the charts above, the average excessive fee percentage was 1757%.

242.     During the Class Period, ERISA Defendants did not engage in an objectively reasonable process when selecting funds for the Plan.

243.     During the Class Period and because ERISA Defendants did not engage in an objectively reasonable process when selecting funds for the Plan, Defendants actually selected the funds identified in the "Defendants' Investment" column in the charts above.

244.     During the Class Period and had ERISA Defendants engaged in an objectively reasonable process when selecting funds for the Plan, Defendants would not have selected the funds identified in the "Defendants' Investment" column in the charts above.

245.     During the Class Period and had ERISA Defendants been acting in the best interests of the Plan's Participants, ERISA Defendants would not have selected the funds identified in the "Defendants' Investment" column in the charts above.

246.     During the Class Period and had ERISA Defendants been acting in the best interests of the Plan's Participants, ERISA Defendants would have selected funds with lower

"expense ratios" than those funds actually selected by ERISA Defendants as identified in the "Defendants' Investment" column in the charts above.

247.    During the Class Period and had ERISA Defendants been acting in the best interests of the Plan's Participants, ERISA Defendants would have selected the funds identified in the "Prudent Alternative Investments" column in the charts above.

248.    During the Class Period, Plaintiff had no knowledge of ERISA Defendants' process for selecting investments and regularly monitoring them to ensure they remained prudent.

249.    During the Class Period, Plaintiff had no knowledge of how the fees charged to and paid by the Plan Participants compared to any other funds.

250.    During the Class Period, Plaintiff did not know about the availability of lower-cost and better-performing (and other essentially identical) investment options that ERISA Defendants failed to reasonably offer because ERISA Defendants provided no comparative information to allow Plaintiff to evaluate and compare ERISA Defendants' investment options.

251.    During the Class Period, Plaintiff did not individually select funds for her 401(k) Plan.

252.    During the Class Period, Defendants failed to reasonably and properly evaluate the true cost of the services of each portfolio manager under the fee structure negotiated with Great-West, thereby paying fees that were more than necessary to the detriment of Plaintiff and the Plan's Participants.

253.    During the Class Period and had ERISA Defendants chosen investment options similar or identical to the funds identified in the "Prudent Alternative Investments" column in the

charts above, the Plan's Participants would have been received the exact same portfolio management services but at a lower cost.

254.    During the Class Period and because ERISA Defendants imprudently chose investment options that were not similar or identical to the funds identified in the "Prudent Alternative Investments" column in the charts above, ERISA Defendants' caused unreasonable and unnecessary losses to Plaintiff and the Plan's Participants.

255.    During the Class Period, ERISA Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options. The chart above demonstrates that the expense ratios of the Plan's investment options between the years 2014 to 2018 were more expensive by significant multiples of comparable passively managed and actively managed alternative funds in the same investment style. A reasonable investigation would have revealed the existence of these lower-cost alternatives.

256.    During the Class Period and because ERISA Defendants failed to act in the best interests of the Plan's Participants by engaging in an objectively reasonable investigation process when selecting its investments, resulting in the selection of funds identified in the "Defendants' Investment" column in the charts above, Plaintiff and the Plan's Participants incurred actual expenses and costs as identified in the "Actual Investment Lineup" portion of the chart below.

257.    During the Class Period and had ERISA Defendants acted in the best interests of the Plan's Participants by engaging in an objectively reasonable investigation process when selecting its investments, ERISA Defendants would have prudently chosen lower-cost investment alternatives as identified in the "Alternative Investment Lineup" portion of the chart below.

258.    During the Class Period and because ERISA Defendants failed to act in the best interests of the Plan's Participants by engaging in an objectively reasonable investigation process when selecting its investments, ERISA Defendants caused unreasonable and unnecessary losses to Plaintiff and the Plan's Participants in the amount of approximately $3,872,598 and as detailed in the following chart:

| Investment Fee Details | | | | | | |
|---|---|---|---|---|---|---|
| **Actual Investment Lineup** | | | | | | |
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| Total Expense Ratio | $621,065 | $590,272 | $639,952 | $745,369 | $537,760 | |
| | | | | | | |
| **Lower-cost Alternative Investments** | | | | | | |
| Total Expense Ratio | $102,822 | $101,365 | $111,424 | $135,997 | $112,671 | |
| | | | | | | |
| Est. Investment Damages | $518,243 | $488,906 | $528,528 | $609,371 | $425,089 | $0 |
| Compounding Percentage (VIIIX) | | 1.39% | 11.95% | 21.82% | -4.41% | 31.48% |
| Est. Cumulative Investment Damages | $518,243 | $1,014,353 | $1,664,096 | $2,636,574 | $2,945,390 | $3,872,598 |

259.    The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was equally as available to ERISA Defendants during the Class Period, including but not limited to Plaintiff's Plan quarterly statements, the Plan's Summary Description, and the Plan's fee disclosures.

260.    During the entirety of the Class Period and by failing to engage in an objectively reasonable investigation process when selecting its investments as described herein, ERISA Defendants breached their fiduciary duties to Plaintiff and the Plan Participants.

## CLASS ACTION ALLEGATIONS FOR ERISA CLAIMS

261.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

262.    In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Infinity Healthcare, Inc. Employees' Flexible Profit Sharing Plan beginning six years before the commencement of this action and running through the date of judgment, excluding the ERISA Defendants or any participant/beneficiary who is a fiduciary to the Plan.

263.    The members of the proposed Class are readily ascertainable. The number and identity of the members of the proposed Class are determinable from the records of ERISA Defendants. For purposes of notice and other purposes related to this action, putative Class members' names and addresses are readily available from ERISA Defendants such that notice can be provided by permissible means under Fed. R. Civ. P. 23.

264.    Although the precise number of putative Class members is unknown, upon information and belief, the proposed Class includes more than 500 members and is so numerous that joinder of all of its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1), and more importantly the disposition of their claims as a class will benefit the parties and the Court.

265.    Plaintiff's claims are common to those claims which could be alleged by any member of the proposed Class, and the relief sought is typical of the relief which would be sought by each member of the proposed Class in separate actions. Common questions of law and fact which predominate this action include, but are not limited to, all of the following:

- Whether ERISA Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether ERISA Defendants breached their fiduciary duties to the Plan;

- The amount of actual monetary losses suffered by the Plan resulting from each breach of fiduciary duty; and

- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

266.    Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a Plan Participant during the Class Period and all putative Class members, as Plan Participants, were harmed by Defendants' misconduct.

267.    Plaintiff is able to fairly and adequately protect the interests of the proposed Class, pursuant to Federal Rule of Civil Procedure 23(a)(4), because Plaintiff has no interests antagonistic to, or that otherwise conflicts with, the interests of the proposed Class, and she is committed to the vigorous representation of the Class. Plaintiff has engaged and is represented by experienced and competent lawyers who are experienced in both class action litigation and complex ERISA claims like those set forth herein.

268.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit a number of similarly-situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

269.    Certification is further appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of: (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §

1109(a); and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

270.     Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because ERISA Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

271.     The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts. The claims asserted on behalf of the Plan fall outside the scope of any exhaustion language in individual participants' plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a plan for breaches of fiduciary duty.

272.     Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the plan.

273.     Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a plan administrator's decision – doesn't exist here because courts will not defer to a plan administrator's legal analysis and interpretation.

**FIRST CLAIM FOR RELIEF**
**Violations of the Fair Labor Standards Act of 1938, as Amended**
**(Plaintiff on behalf of herself and the FLSA Collective against Defendant Infinity Physician**
**– Overtime Pay Owed)**

274.    Plaintiff, on behalf of herself and the FLSA Collective, reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

275.    At all times material herein, Plaintiff and the FLSA Collective have been entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. § 201 *et seq.*

276.    At all times material herein, Defendant Infinity Physician was an employer of Plaintiff and the FLSA Collective as provided under the FLSA.

277.    At all times material herein, Plaintiff and the FLSA Collective were employees of Defendant Infinity Physician as provided under the FLSA.

278.    Plaintiff and the FLSA Collective are victims of uniform compensation policy and practice in violation of the FLSA.

279.    Defendant Infinity Physician violated the FLSA by failing to account for and compensate Plaintiff and the FLSA Collective for overtime premium pay at the proper and correct overtime rate of pay for each hour worked in excess of forty (40) hours each workweek by failing to include all forms of non-discretionary compensation in the FLSA Collective's regular rates of pay for overtime calculation purposes.

280.    The FLSA regulates, among other things, the payment of an overtime premium by employers whose employees are engaged in commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce. 29 U.S.C. § 207(a)(1).

281.   Defendant Infinity Physician was (and is) subject to the overtime pay requirements of the FLSA because Defendant is an enterprise engaged in commerce and/or its employees are engaged in commerce, as defined in FLSA, 29 U.S.C. § 203(b).

282.   Defendant Infinity Physician's failure to properly compensate Plaintiff and the FLSA Collective and failure to properly include all forms of non-discretionary compensation in the regular rate of pay for overtime calculations purposes was willfully perpetrated. Defendant Infinity Physician also has not acted in good faith or with reasonable grounds to believe its actions and omissions were not a violation of the FLSA, and as a result thereof, Plaintiff and the FLSA Collective are entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid overtime premium pay described above pursuant to Section 216(b) of the FLSA, 29 U.S.C. § 216(b). Alternatively, should the Court find that Defendant Infinity Physician acted in good faith or with reasonable grounds in failing to pay overtime premium pay wages, Plaintiff and the FLSA Collective are entitled to an award of pre-judgment interest at the applicable legal rate.

283.   As a result of the aforesaid willful violations of the FLSA's provisions, overtime compensation has been unlawfully withheld by Defendant Infinity Physician from Plaintiff and the FLSA Collective for which Defendant is liable pursuant to 29 U.S.C. § 216(b).

284.   Plaintiff and the FLSA Collective are entitled to damages equal to the mandated overtime premium pay within the three (3) years preceding the date of filing of this Complaint, plus periods of equitable tolling because Defendant Infinity Physician acted willfully and knew or showed reckless disregard of whether its conduct was prohibited by the FLSA.

285.    Pursuant to FLSA, 29 U.S.C. § 216(b), successful plaintiffs are entitled to reimbursement of the costs and attorneys' fees expended in successfully prosecuting an action for unpaid wages and overtime wages.

**SECOND CLAIM FOR RELIEF**
**Violations of Wisconsin's Wage Payment and Collection Laws, as Amended**
**(Plaintiff, on behalf of herself and the Wisconsin Class, against Defendant Infinity**
**Physician – Overtime Pay Owed)**

286.    Plaintiff, on behalf of herself and the Wisconsin Class, re-allege and incorporate all previous paragraphs as if they were set forth herein.

287.    At all relevant times: Plaintiff and the Wisconsin Class were employees of Defendant Infinity Physician within the meaning of Wis. Stat. §§ 109.01(1r), 103.001(5), and 104.01(2)(a); Defendant Infinity Physician was an employer of Plaintiff and the Wisconsin Class within the meaning of Wis. Stat. §§ 109.01(2), 103.001(6), and 104.01(3)(a), and Wis. Admin. Code § DWD 272.01(5); and Defendant Infinity Physician employed, and/or continue to employ, Plaintiff and the Wisconsin Class within the meaning of Wis. Stat. §§ 109.01 *et seq.*, 103.01 *et seq.*, 104.01 *et seq.*, and § DWD 272.01.

288.    Throughout the Wisconsin Class Period, Plaintiff and the Wisconsin Class regularly performed activities that were an integral and indispensable part of their principal activities without receiving compensation for these activities.

289.    At all relevant times, Defendant Infinity Physician had common policies, programs, practices, procedures, protocols, routines, and rules of willfully failing to properly pay Plaintiff and the Wisconsin Class overtime compensation.

290.    Defendant Infinity Physician willfully failed to pay Plaintiff and the Wisconsin Class overtime premium compensation for all hours worked in excess of forty (40) hours a workweek in violation of Wisconsin Wage Payment Laws by failing to include all forms of non-

discretionary compensation in the Wisconsin Class' regular rates of pay for overtime calculation purposes.

291.   The foregoing conduct, as alleged above, constitutes continuing, willful violations of the Wisconsin Wage Payment and Collection Laws.

292.   As set forth above, Plaintiff and the Wisconsin Class members have sustained losses in their compensation as a proximate result of Defendant Infinity Physician's violations. Accordingly, Plaintiff and the Wisconsin Class seek damages in the amount of their respective unpaid compensation, injunctive relief requiring Defendant Infinity Physician to cease and desist from its violations of the Wisconsin laws described herein and to comply with them, and such other legal and equitable relief as the Court deems just and proper. Under Wis. Stat. § 109.11, Plaintiff and the Wisconsin Class may be entitled to liquidated damages equal and up to fifty percent (50%) of the unpaid wages.

293.   Plaintiff and the Wisconsin Class seek recovery of attorneys' fees and the costs of this action to be paid by Defendant Infinity Physician pursuant to the WWPCL.

### THIRD CLAIM FOR RELIEF
### Breaches of Duties of Loyalty and Prudence of ERISA, as Amended
### (Plaintiff, on behalf of herself and Class, against ERISA Defendants – RK&A Fees)

294.   Plaintiff restates the above allegations as if fully set forth herein.

295.   ERISA Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

296.   29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan.

297.   ERISA Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges reasonable RK&A fees.

298.     During the Class Period, ERISA Defendants had a fiduciary duty to do all of the following: ensure that the Plan's RK&A fees were reasonable; manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

299.     During the Class Period, ERISA Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiff, by failing to ensure that the Plan's RK&A fees were reasonable, manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries, defray reasonable expenses of administering the Plan, act with the care, skill, diligence, and prudence required by ERISA.

300.     During the Class Period, ERISA Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding recordkeeping services and the significant bargaining power the Plan had to negotiate the best fees.

301.     During the Class Period, ERISA Defendants breached their duty to Plan Participants, including Plaintiff, by failing to employ a prudent and loyal process by failing to critically or objectively evaluate the cost and performance of the Plan's recordkeeper in comparison to other recordkeeping options.

302.     Through these actions and omissions, ERISA Defendants breached their fiduciary duties of prudence and loyalty with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(A).

303.     ERISA Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent

person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

304.    As a result of ERISA Defendants' breach of fiduciary duty of prudence and loyalty with respect to the Plan, as aforesaid, the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses.

305.    ERISA Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, ERISA Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

**FOURTH CLAIM FOR RELIEF**
**Breaches of Duties of Loyalty and Prudence of ERISA, as Amended**
**<u>(Plaintiff, on behalf of herself and Class, against ERISA Defendants – Investment Management Fees)</u>**

306.    Plaintiff restates the above allegations as if fully set forth herein.

307.    ERISA Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

308.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon ERISA Defendants in managing the investments of the Plan.

309.    ERISA Defendants, as fiduciaries of the Plan, are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently.

310.    During the Class Period, ERISA Defendants had a fiduciary duty to do all of the following: manage the assets of the Plan for the sole and exclusive benefit of Plan Participants

and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

311.    During the Class Period, ERISA Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiff, by failing to manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries, defray reasonable expenses of administering the Plan, act with the care, skill, diligence, and prudence required by ERISA.

312.    ERISA Defendants, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess whether the Plan's investments were prudent choices for the Plan and to remove imprudent investment options regardless of how long said investments had been in the Plan.

313.    During the Class Period, ERISA Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiff, by failing to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period.

314.    ERISA Defendants were directly responsible for ensuring that the Plan's investment management fees were reasonable, selecting investment options in a prudent fashion in the best interest of Plan Participants, prudently evaluating and monitoring the Plan's investments on an ongoing basis and eliminating funds or share classes that did not serve the best interest of Plan Participants, and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

315.    ERISA Defendants failed to employ a prudent and loyal process by failing to critically or objectively evaluate the cost and performance of the Plan's investments and fees in

comparison to other investment options. ERISA Defendants selected and retained for years as Plan investment options mutual funds with high expenses relative to other investment options that were readily available to the Plan at all relevant times.

316.    Through these actions and omissions, ERISA Defendants breached their fiduciary duties of prudence and loyalty with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(A).

317.    ERISA Defendants failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

318.    As a result of ERISA Defendants' breach of their fiduciary duties of prudence and loyalty with respect to the Plan, as aforesaid, the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses.

319.    ERISA Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, ERISA Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

## FIFTH CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
### (Plaintiff, on behalf of herself and Class, against ERISA Defendants – RK&A Fees)

320.    Plaintiff restates the above allegations as if fully set forth herein.

321.    ERISA Defendants had the authority to appoint and remove members or individuals responsible for Plan RK&A fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

322.    In light of this authority, ERISA Defendants had a duty to monitor those individuals responsible for Plan RK&A fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

323.    ERISA Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to ERISA Defendants.

324.    ERISA Defendants breached their fiduciary duties by, among other things:

a.    Failing to monitor and evaluate the performance of individuals responsible for Plan RK&A fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high RK&A expenses;

b.    Failing to monitor the process by which Plan recordkeepers were evaluated and failing to investigate the availability of lower-cost recordkeepers; and

c.  Failing to remove individuals responsible for Plan RK&A fees whose performance was inadequate in that these individuals continued to pay the same RK&A costs even though benchmarking and using other similar comparators would have showed that maintaining Great-West as record keeper was imprudent, excessively costly, all to the detriment of the Plan and Plan Participants' retirement savings.

325.  As the consequences of the foregoing breaches of the duty to monitor for RK&A fees the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses.

326.  Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), ERISA Defendants are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan RK&A fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**SIXTH CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**<u>(Plaintiff, on behalf of herself and Class, against ERISA Defendants – Investment</u>**
**<u>Management Fees)</u>**

327.  Plaintiff restates the above allegations as if fully set forth herein.

328.  ERISA Defendants had the authority to appoint and remove members or individuals responsible for Plan investment management and were aware that these fiduciaries had critical responsibilities for the Plan.

329.  In light of this authority, ERISA Defendants had a duty to monitor those individuals responsible for Plan investment management to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

330.    ERISA Defendants had a duty to ensure that the individuals responsible for Plan investment management possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to ERISA Defendants.

331.    ERISA Defendants breached their fiduciary duties by, among other things:

a.  Failing to monitor and evaluate the performance of individuals responsible for Plan investment management or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high expenses, choices of fund's class of shares, and inefficient fund management styles that adversely affected the investment performance of the funds' and their Participants' assets as a result of these individuals responsible for Plan imprudent actions and omissions;

b.  Failing to monitor the process by which Plan investments were evaluated, failing to investigate the availability of lower-cost share classes, and failing to investigate the availability of lower-cost collective trust vehicles; and

c.  Failing to remove individuals responsible for Plan administration whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments

within the Plan, all to the detriment of the Plan and Plan Participants' retirement savings.

332.    As a result of ERISA Defendants' foregoing breaches of the duty to monitor, the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses.

333.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Infinity Health is liable to restore to the Plan  all loses caused by their failure to adequately monitor individuals responsible for Plan administration. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**WHEREFORE**, it is respectfully prayed that this Court grant the following relief:

A.    At the earliest possible time, issue an Order allowing Notice, or issue such Court supervised Notice, to all similarly-situated current and former hourly-paid, non-exempt employees employed by Defendant Infinity Physician informing them of this action and their rights to participate in this action. Such Notice shall inform all similarly-situated current and qualified former employees of the pendency of this action, the nature of this action, and of their right to "opt in" to this action. Additionally, such notice will include a statement informing the similarly-situated current and qualified former employees that it is illegal for Defendant Infinity Physician to take any actions in retaliation of their consent to join this action;

B.    At the earliest possible time, issue an Order certifying this action as a class action pursuant to Federal Rules of Civil Procedure 23;

C.    At the earliest possible time, issue an Order appointing Walcheske & Luzi, LLC as class counsel pursuant to Federal Rules of Civil Procedure 23;

D.    Issue an Order, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, declaring Defendant Infinity Physician's actions as described in the Complaint as unlawful and in violation of the FLSA and Wisconsin Law and applicable regulations and as willful as defined in the FLSA and Wisconsin Law;

E.    Issue an Order directing and requiring Defendant Infinity Physician to pay Plaintiff and all other similarly-situated hourly-paid, non-exempt employees damages in the form of reimbursement for unpaid overtime wages for all time spent performing compensable work for which they were not paid pursuant to the rate provided by the FLSA and WWPCL;

F.   Issue an Order directing and requiring Defendant to pay Plaintiff and all other similarly-situated hourly-paid, non-exempt employees liquidated damages pursuant to the FLSA and WWPCL in an amount equal to, and in addition to the amount of wages and overtime wages owed to them;

G.   Issue an Order directing Defendant Infinity Physician to reimburse Plaintiff and all other similarly-situated hourly-paid, non-exempt employees for the costs and attorneys' fees expended in the course of litigating this action, pre-judgment and post-judgment interest;

H.   Provide Plaintiff and all other similarly-situated hourly-paid, non-exempt employees with such other and further relief, as the Court deems just and equitable;

I.   A determination that the ERISA claims may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

J.   Designation of Plaintiff as ERISA Class Representative and designation of Plaintiff's counsel as ERISA Class Counsel;

K.   A Declaration the ERISA Defendants have breached their fiduciary duties under ERISA;

L.   An Order compelling the ERISA Defendants to make good to the Plan all losses to the Plan resulting from ERISA Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets, restoring to the Plan all profits the ERISA Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the participants would have made if the ERISA Defendants had fulfilled their fiduciary obligation;

M.   An Order requiring the Defendant Infinity Healthcare, Inc. to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against Infinity Healthcare as necessary to effectuate said relief, and to prevent Infinity Healthcare's unjust enrichment;

N.   An Order enjoining ERISA Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

O.   Other equitable relief to redress ERISA Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan Fiduciaries deemed to have breached their fiduciary duties;

P.  An award of pre-judgment interest;

Q.  An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

R.  Such other and further relief as the Court deems equitable and just.

**PLAINTIFF DEMANDS A JURY AS TO ALL TRIABLE ISSUES**

Dated this 7th day of August, 2020

WALCHESKE & LUZI, LLC
Counsel for Plaintiff

<u>**s/ _Paul M. Secunda_**</u>
James A. Walcheske, State Bar No. 1065635
Scott S. Luzi, State Bar No. 1067405
Paul M. Secunda, State Bar No. 1074127

WALCHESKE & LUZI, LLC
15850 W. Bluemound Rd., Suite 304
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
Fax: (262) 565-6469
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com